UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

ALEXIS STEWART,

                              Plaintiff,                                    **MEMORANDUM & ORDER**

                    -against-                                              **13-CV-3613 (NGG) (VMS)**

DORA SCHIRO, KELVIN MADISON,
LATASHA HICKS, and
the CITY OF NEW YORK,
                              Defendants.
--------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Pro se Plaintiff Alexis Stewart brings this action against two employees of the City of

New York Department of Correction ("DOC")—Correction Officer ("C.O.") Latasha Hicks and

C.O. Kelvin Madison—and against the City of New York (the "City") (collectively, the

"Defendants").[1] Plaintiff asserts claims of failure-to-protect, denial of due process, cruel and

unusual punishment, and municipal liability, pursuant to 42 U.S.C. § 1983, as well as a state law

negligence claim, in connection with an incident that occurred on August 16, 2012, while

Plaintiff was in custody at the Otis Bantum Correctional Center ("OBCC") at Rikers Island.[2]

Defendants have moved for summary judgment on all claims. (Not. of Mot. for Summ. J.

(Dkt. 103).) For the reasons explained below, Defendants' motion is GRANTED, and all claims

against all Defendants are DISMISSED.

---

[1] The court previously dismissed an additional Defendant, former DOC Commissioner Dora Schriro (s/h/a Dora Schiro). (See July 29, 2013, Mem. & Order (Dkt. 12) at 4.)

[2] Plaintiff's pro se Complaint (Dkt. 1) does not expressly assert these five claims; read in the light most favorable to Plaintiff, the court construes the Complaint as asserting each of these claims.

## I. BACKGROUND

### A. Facts

The following facts are either undisputed, or where facts are in dispute, viewed in the light most favorable to Plaintiff.[3]

#### 1. August 16, 2012, Incident

On August 16, 2012, Plaintiff was incarcerated at the OBCC. (Defs.' Rule 56.1 St. ("Defs.' 56.1") (Dkt. 105) ¶ 1; Pl.'s Rule 56.1 St. ("Pl.'s 56.1") (Dkt. 109) ¶ 1.) A crowd of inmates began arguing about which inmate was assigned to a particular bed located next to the bed of inmate William Simmons. (Tr. of Feb. 20, 2014, Dep. of Alexis Stewart ("Pl. Dep.")

---

[3] Plaintiff addressed the facts asserted in Defendants' Rule 56.1 Statement (Dkt. 105) in his own opposing statement (see Pl.'s Rule 56.1 St. (Dkt. 109)); however, he did not address those facts in correspondingly numbered paragraphs. Cf. Local Civil Rule 56.1. Plaintiff included additional material facts in his Rule 56.1 Statement, but also alleged additional facts not included in his Rule 56.1 Statement in his other papers, including his opposing memorandum (Pl.'s Mem. in Opp'n ("Pl.'s Opp'n") (Dkt. 119-1)), declaration (Decl. of Alexis Stewart in Opp'n to Defs.' Mot. for Summ. J. ("Pl. Decl.") (Dkt. 110)), and exhibits (Pl. Decl., Exs. A-N (Dkts. 110-1 to -14, 122)). Because Plaintiff is proceeding pro se, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact. See McClendon v. Cnty. of Nassau, No. 11-CV-0190 (SJF) (ETB), 2012 WL 4849144, at *2 (E.D.N.Y. Oct. 11, 2012); Williams v. City of New York, No. 06-CV-6601 (NGG), 2009 WL 3254465, at *1 n.1 (E.D.N.Y. Oct. 9, 2009). The court treats Plaintiff's notarized filings, such as his opposition memorandum and his Complaint, as sworn statements. See Washington v. William Morris Endeavor Entm't, LLC, No. 10-CV-9647 (PKC), 2014 WL 4401291, at *1 n.1 (S.D.N.Y. Sept. 5, 2014); Geldzahler v. N.Y. Med. Coll., 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010).

Due to several electronic filing errors, two additional notes are warranted. First, Defendants mistakenly filed incomplete versions of Exhibits D and E to Plaintiff's declaration (see Pl.'s Aug. 25, 2014, Ltr. (Dkt. 118); Sept. 15, 2014, Order (Dkt. 121)); in deciding this motion, the court has considered the corrected versions of the exhibits (see Dkt. 122). Second, Defendants originally filed a marked-up version of Plaintiff's opposition brief, mistakenly believing that Plaintiff was under an obligation to send an original copy of his opposition papers to the court. (See Defs.' July 29, 2014, Ltr. (Dkt. 111) ("Defendants write respectfully to inform the Court that, because plaintiff has failed to send defendants or the Pro Se Office a courtesy copy of his Opposition papers, the undersigned is filing on ECF plaintiff's original Opposition papers with markings made by the undersigned. The undersigned has, to the best of her abilities, used white-out to delete her markings.").) At the court's invitation (see Aug. 4, 2014, Order (Dkt. 113)), Plaintiff subsequently sent a "clean" copy of his opposition brief to the court (see Pl.'s Opp'n (Dkt. 119)). There are, however, minimal differences between the marked-up version of Plaintiff's brief filed by Defendants and the clean version of the brief filed by Plaintiff—the court can only guess, but these differences (the majority of which are typographical or stylistic) may reflect the fact that Plaintiff used a copy of the marked-up version sent to him by the court to manually re-type a clean version of the brief. Because the differences between the two briefs are minimal, and because fault lies with Defendants for failing to follow the court's Individual Rules in the first place, the court considers the clean version of the brief filed by Plaintiff for purposes of this motion. Counsel for Defendants is reminded that pursuant to the court's Individual Rules, the moving party is responsible for filing a fully briefed motion and providing a clean set of courtesy copies to the court. See Individual Rules of Judge Nicholas G. Garaufis, Rule III.B.2.

(Dkt. 123-1) at 6:24-25, 7:56, 8:5-10.)[4] C.O. Hicks entered and told the inmates to go to sleep. (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Plaintiff was standing three to four feet away from Simmons. (Pl. Dep. at 7:13-14.) In a playful or joking manner, Plaintiff asked Simmons to confirm that the bed in question was another inmate's bed, and not Simmons's. (Id. at 7:3-6.) Simmons responded aggressively and told Plaintiff to "shut the fuck up and get away from my bed." (Defs.' 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.)

C.O. Hicks approached Plaintiff and Simmons while they continued to converse. (Defs.' 56.1 ¶ 6; Pl. Dep. at 7:10-12.) Plaintiff attempted to explain to Simmons that he was not trying to get on Simmons's nerves. (Pl.'s 56.1 ¶ 8; Pl. Dep. at 7:8-9.) When C.O. Hicks reached the bed, Simmons, who had been lying down, got up, pushed C.O. Hicks out of the way, and ran towards Plaintiff. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 10; Pl. Dep. at 7:13-17, 9:3-7.) Simmons punched Plaintiff approximately three times in the face. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 10.) After the third punch by Simmons, Plaintiff punched Simmons in order to defend himself. (Pl.'s 56.1 ¶ 12.)

C.O. Hicks ordered Plaintiff and Simmons to stop fighting, and took out her oleoresin capsicum ("OC") spray, a chemical agent that irritates the eyes and skin. (Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶ 13.) Plaintiff and Simmons ceased fighting because C.O. Hicks gave them the impression that she would otherwise spray them with the OC spray. (Defs.' 56.1 ¶ 10; Pl. Dep. at 15:23-16:6.) Plaintiff also speculates that he and Simmons stopped fighting because by that point they were tired. (Pl. Dep. at 16:2-3.)

In total, the fight lasted one to three minutes. (Id. at 9:22-23.) During his deposition, Plaintiff agreed with a statement by defense counsel that the incident was a "random attack"

---

[4] Although Defendants originally filed excerpts of the transcript of Plaintiff's February 20, 2014, deposition, at the court's direction, Defendants electronically filed the entire transcript. (See Defs.' Sept. 19, 2014, Ltr. (Dkt. 123).)

(id. at 13:21-22), and stated that he had not approached Simmons in an aggressive manner (id. at 14:1-3). Although the commencement of punching by Simmons occurred "in a split second" (id. at 14:17), Plaintiff disputes that the entire incident unfolded so quickly (see Pl.'s 56.1 ¶ 21).

Soon after the fight ended, correction officers with body armor, shields, and helmets arrived and escorted Plaintiff and Simmons out of the dorm room in which the fight occurred. (Defs.' 56.1 ¶ 11; Pl.'s 56.1 ¶ 15.) Plaintiff later underwent a disciplinary hearing as a result of the incident and received twelve days of punitive segregation for refusing a direct order and for fighting. (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 18.)

As a result of the incident, Plaintiff suffered from a bloody mouth, swollen eyes, and bruised hands. (Pl. Dep. at 28:18-19.) Although Plaintiff claims that Simmons suffered no injuries as a result of the altercation (see Pl.'s 56.1 ¶ 17), the hearing report that Plaintiff submitted in support of this contention does not fully support it. (See Aug. 22, 2012, Hr'g Rep. & Not. of Disciplinary Disposition for William Simmons (Decl. of Alexis Stewart in Opp'n to Defs.' Mot. for Summ. J. ("Pl. Decl.") (Dkt. 110), Ex. J (Dkt. 110-10) (showing that during Simmons's disciplinary hearing, no photographs of injuries were included as documentary evidence, and referencing, but not attaching, a "6500A Injury Report")).) In sum, the record before the court does not indicate whether only Plaintiff sustained injuries as a result of the fight, or whether both Plaintiff and Simmons sustained injuries.

Plaintiff never feared for his safety while incarcerated at OBCC. (Defs.' 56.1 ¶ 13; Pl. Dep. at 18:24-19:4.) Plaintiff had never been involved in a physical altercation while incarcerated at OBCC prior to the incident with Simmons. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 19.) Plaintiff had no reason to suspect that Simmons would attack him. (Defs.' 56.1 ¶ 15; Pl.'s 56.1

4

¶ 20.) Simmons never threatened to harm Plaintiff in advance of the incident. (Defs.' 56.1 ¶ 16; Pl. Dep. at 12:17-19.) No other inmate had ever threatened Plaintiff with physical harm while he was incarcerated at OBCC. (Defs.' 56.1 ¶ 17; Pl. Dep. at 12:20-22.)

### 2. C.O. Madison's Role

The role C.O. Madison played in the incident is less than clear. For purposes of this motion, the court takes as true that C.O. Hicks was the only correction officer present during the altercation (see, e.g., Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3), and that C.O. Madison was not present at the time of the fight (see Defs.' 56.1 ¶ 20 ("Plaintiff does not allege that C.O. Madison . . . was present at the location where the fight occurred."); Pl.'s 56.1 ¶ 23 ("Plaintiff does not allege that C.O. Madison was[] present at the location where the fight occurred."); id. ¶ 29 ("The plaintiff is suing C.O. Madison for issuing a disciplinary infraction against him and correction cover-[ups].")).

During his deposition, Plaintiff testified that he only remembers seeing a female correction officer during the incident, C.O. Hicks. (See Pl. Dep. at 16:10-12.) Plaintiff also confirmed that he does not remember seeing C.O. Madison during the incident. (Id.) Plaintiff sued C.O. Madison because, according to Plaintiff, C.O. Madison signed the infraction ticket for the incident. (Id. at 16:18-19, 17:5-8.) A report and notice of infraction dated August 16, 2012, describes the incident in question and is signed by C.O. Madison. (See Aug. 16, 2012, Rep. & Not. of Infraction for Alexis Stewart ("Rep. & Not. of Infraction") (Pl. Decl., Ex F (Dkt. 110-6)).) In the Report and Notice of Infraction, C.O. Madison stated the following:

> At approx[imately] 0030 hrs I observed several inmates arguing. I gave several direct orders for the inmates to stop arguing and return to their assigned beds. I then witnessed inmate Simmons . . . punch inmate Stewart . . . in the face with a closed fist. Inmates Simmons [] and Stewart [] immediately exchanged closed fist punches to the face of each other. I ordered Simmons []

5

and Stewart [] to stop fighting and they did not comply. At this
time I activated my PBA[5] [] and gave another direct order for
Simmons [] and Stewart [] to stop fighting. Inmates Simmons and
Stewart complied. Probe team responded to the area and escorted
Simmons and Stewart out without further incident.

(Id.) On either August 16, 2012, or August 18, 2012,[6] Plaintiff certified that he received a copy

of the Report and Notice of Infraction. (Id.) An investigation report, dated August 18, 2012,

recounts a similar description of the incident and reflects that the report is based on

"written/verbal statements" from C.O. Madison and medical staff. (Aug. 18, 2012, Investigation

Rep. ("Investigation Rep.") (Pl. Decl., Ex. N (Dkt. 110-14)).)

The Report and Notice of Infraction reflects that C.O Madison was assigned

to "1 Upper B," and that the incident occurred in "1 upper aisle of dorm." (Rep. & Not. of

Infraction.) Further complicating whether C.O. Hicks and/or C.O. Madison was present during

the incident is a DOC logsheet for the week of August 12, 2012, showing the assignment of

shifts to various C.O.s and the locations of those shifts within the OBCC. (DOC Logsheet (Pl.

Decl., Ex. I (Dkt. 110-9)).) Although heavily redacted, the logsheet reflects that C.O. Hicks was

assigned to "1&2 UPPER A" on August 15, 2012, and August 16, 2012. (Id.) It appears that a

C.O. Evans was assigned to "1 UPPER B" on August 15, 2012, and August 16, 2012. (Id.) The

logsheet and the record before the court for purposes of this motion do not reflect C.O.

Madison's assignment on August 15, 2012, or August 16, 2012.[7] C.O. Madison's role is

discussed in more detail in Part III.B.3.b infra.

---

[5] The record does not reflect what "PBA" refers to.

[6] The date is not fully legible.

[7] The court notes that both C.O. Hicks and C.O. Madison have been served with copies of the Complaint and are
represented by counsel. (See Summons (Dkt. 19) (C.O. Madison); Am. Summons (Dkt. 71) (C.O. Hicks).)
Although Defendants are under no affirmative obligation to submit evidence in support of their motion for summary
judgment, the court also notes that neither C.O. Hicks nor C.O. Madison submitted a declaration in support of the
motion for summary judgment, nor has either been deposed. Indeed, the only materials submitted by Defendants in

6

3.  The City's Policies

In opposition to the motion for summary judgment, Plaintiff also submitted the following policy documents: (1) a DOC Directive, effective March 29, 2006, with the subject "Inmate Disciplinary Due Process," establishing a procedure for processing pre-hearing detention and inmate disciplinary infractions ("Inmate Disciplinary Due Process Directive") (Pl. Decl., Ex. D (Dkt. 122)); and (2) a DOC Directive, effective January 31, 2008, with the subject "Use of Force," establishing a policy concerning the use of force by prison staff ("Use of Force Directive") (Pl. Decl., Ex. E (Dkt. 122-1)). These policies are discussed in more detail in Part III.C infra.

4.  Plaintiff's Status at the Time of August 16, 2012, Incident

As discussed in the court's discussion below, an inmate's particular status—e.g., a pretrial detainee, versus a sentenced criminal—at the time of an alleged constitutional deprivation is relevant for certain of the constitutional claims raised by Plaintiff.

The parties, however, did not demonstrate to the court Plaintiff's status at the time of the August 16, 2012, incident. Indeed, Defendants appear simultaneously to argue that Plaintiff was both a pretrial detainee and a sentenced criminal. In their analysis of Plaintiff's failure-to-protect claim, Defendants state that "[P]laintiff was incarcerated as a pretrial detainee at the time of the incident" (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. 107) at 4), but further explain that the legal framework governing the failure-to-protect analysis is the same for pretrial detainees (under the Fifth and Fourteenth Amendments) as it is for sentenced criminals (under the Eighth Amendment) (id. at 4-5). See also infra Part III.A. Later, however, in connection with their analysis of Plaintiff's procedural due process claim, Defendants analyze

support of the motion are the Complaint and the transcript of Plaintiff's February 20, 2014, deposition. Although proceeding pro se, Plaintiff submitted several exhibits in support of his opposition, including documents reflecting the discipline that he received as a result of the fight with Simmons.

the "atypical and significant hardship" legal framework (see Defs.' Mem. at 9-11), which applies to sentenced criminals, but which does not apply to pretrial detainees. See infra Parts III.B.2 and III.B.3.

For purposes of this motion, the court therefore takes judicial notice of the following facts. See Fed. R. Evid. 201. On May 31, 2012, Plaintiff pleaded guilty in New York Supreme Court, Kings County, to charges of Assault in the Second Degree, N.Y. Penal L. § 120.05(12), and Assault in the Third Degree, N.Y. Penal L. § 120.00(1). (See Guilty Plea, People v. Stewart, No. 1750-12 (N.Y. Sup. Ct., Kings Cnty. May 31, 2012) (attached as Exhibit A to this Memorandum and Order).) On September 12, 2012, Plaintiff was sentenced to a five-year term of imprisonment and three years of post-release supervision. (See Original Sentence, People v. Stewart, No. 1750-12 (N.Y. Sup. Ct., Kings Cnty. Sept. 12, 2012) (attached as Exhibit B to this Memorandum and Order).) See also People v. Stewart, 997 N.Y.S.2d 332, 332 (N.Y. App. Div. 2014) (referencing September 12, 2012, sentencing date). On December 24, 2012, the New York Supreme Court, Appellate Division, modified the sentence to a term of imprisonment of three years and two years of post-release supervision. Stewart, 997 N.Y.S.2d at 332. The court discusses the relevance of these judicially noticed facts in Parts III.A and III.B.2 infra. At this stage, suffice it to say that the August 16, 2012, fight and resulting discipline occurred during the few months between Plaintiff's guilty plea and conviction in May 2012, and his sentencing in September 2012.

### B. Procedural History

Plaintiff filed his Complaint against Defendants on June 17, 2013. (Compl.) As discussed above, the court sua sponte dismissed all claims against former DOC Commissioner Dora Schriro (s/h/a/ Dora Schiro). (See July 29, 2013, Mem. & Order at 4.) No motion to

dismiss was filed. C.O. Madison and the City filed an Answer to the Complaint on
September 25, 2013 (Answer (Dkt. 23)), and C.O. Hicks (originally sued as a Jane Doe) filed an
Answer to the Complaint on March 11, 2014 (Answer (Dkt. 75)). Discovery proceeded before
Magistrate Judge Vera M. Scanlon. Upon the close of discovery, Judge Scanlon granted
Defendants' request to file a motion for summary judgment and set a briefing schedule. (See
Mar. 11, 2014, Order.) Defendants filed their fully briefed motion on July 29, 2014. (See Not.
of Mot. for Summ. J.) Plaintiff opposes the motion.

## II.    LEGAL STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is
material if it "might affect the outcome of the suit under the governing law." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine dispute of material fact exists if "the
record taken as a whole could not lead a rational trier of fact to find for the non-moving party."
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating
a motion for summary judgment, the court "is required to construe the evidence in the light most
favorable to the non-moving party and to draw all reasonable inferences in its favor." Trammell
v. Keane, 338 F.3d 155, 161 (2d Cir. 2003); see also Anderson, 477 U.S. at 255 ("The evidence
of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute.
See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment will be
granted if the opposing party then "fails to make a showing sufficient to establish the existence
of an element essential to that party's case, and on which that party will bear the burden of proof
at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, the

opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and may not rely on "conclusory allegations," Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990). Where the party opposing summary judgment is proceeding pro se, the court must construe his filings liberally. See Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006).

## III.  DISCUSSION

Plaintiff brings claims against C.O. Hicks, C.O. Madison, and the City. Specifically, Plaintiff asserts claims against C.O. Hicks and C.O. Madison for "letting another inmate attack [him] and not doing anything about it" (Pl. Dep. at 17:6-8), and against Defendants for imposing 12 days of segregated confinement on Plaintiff for his role in the fight. In addition, Plaintiff asserts that C.O. Madison violated his due process rights by falsely charging him with a disciplinary violation. (See id. at 34:19-35:12.) Finally, Plaintiff asserts that the City is liable "for letting another inmate assault [him], for negligence, [and] for deliberate indifference." (Id. at 33:13-14.)

### A.    Failure-to-Protect Claim

It is well established that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to [a convicted] inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). Where an individual is incarcerated as a pretrial detainee, protection from mistreatment arises from the Due Process Clause of the Fifth Amendment (if in federal custody) or the Due Process Clause of the Fourteenth Amendment (if in state custody). Courts, however, apply the same "deliberate indifference" standard from the Eighth Amendment context to such claims. See Caiozzo v. Koreman, 581 F.3d 63, 69-72 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or

safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."). Thus, for Plaintiff's failure-to-protect claim, it makes no difference whether he was a pretrial detainee or a sentenced criminal.

For purposes of the Eighth Amendment analysis, there is "no significant distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement," such as the failure to protect inmates. Wilson v. Seiter, 501 U.S. 294, 303 (1991) (internal quotation marks omitted); see also Mena v. City of New York, No. 13-CV-2430 (RJS), 2014 WL 4652570, at *3 (S.D.N.Y. Sept. 18. 2014) (explaining that the three basic theories of liability under the Eighth Amendment—denial of medical care, unconstitutional conditions of confinement unrelated to medical care, and failure to protect—are all analyzed under the same framework). Here, Plaintiff's claim is based on Defendants' failure to protect him from another inmate.

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. To state a claim, "an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind . . . , such as deliberate indifference to inmate health or safety." Walker v. Schult, 717 F.3d 119, 225 (2d Cir. 2013) (internal quotation marks and citation omitted).

Under the objective prong, "an inmate must show 'actual or imminent harm.'" Benjamin v. Fraser, 343 F.3d 35, 51 n.17 (2d Cir. 2003) (quoting Lewis v. Casey, 518 U.S. 343, 350 (1996)), overruled on other grounds, Caiozzo, 343 F.3d at 70. In other words, under the objective prong, "[f]or a claim . . . based on a failure to prevent harm, the inmate must show that

he is incarcerated under conditions posing a <u>substantial risk of serious harm.</u>" <u>Farmer</u>, 511 U.S. at 834 (emphasis added). Under the objective prong, a plaintiff must also show that the alleged deprivation was, "in objective terms, 'sufficiently serious.'" <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994) ("<u>Hathaway I</u>") (quoting <u>Wilson</u>, 501 U.S. at 298). .

"[T]he subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" <u>Hathaway v. Coughlin</u>, 99 F.3d 550, 553 (2d Cir. 1996) ("<u>Hathaway II</u>") (quoting <u>Farmer</u>, 511 U.S. at 835). This state of mind "is the equivalent of criminal recklessness." <u>Id.</u> To be "sufficiently culpable," the prison official must "'know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).

Plaintiff claims that C.O. Hicks violated his constitutional rights by failing to protect him from the assault by Simmons. Based on the evidence before the court, however, a reasonable jury could not find that there was an objective, substantial risk of sufficiently serious harm to Plaintiff, or that C.O. Hicks knew of such a risk and disregarded it with the requisite level of culpability.

With respect to the objective prong, it is undisputed that Plaintiff had never been involved in an attack before the incident in question, and certainly had never been attacked by Simmons. (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 19.) Indeed, Plaintiff himself had no reason to suspect that Simmons would attack him on the night in question. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 20.) Thus, Plaintiff has failed to put forward any evidence tending to show that on the night in question, there was a substantial risk of harm to himself or other inmates. <u>See, e.g.</u>, <u>Gilmore v.</u>

Rivera, No. 13-CV-6955 (RWS), 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014) (dismissing claim as a matter of law where "nothing suggests that DOC or the other Defendants would have known [prior to the incident] that Plaintiff himself was at risk"); Desulma v. City of New York, No. 98-CV-2078 (RMB) (RLE), 2001 WL 798002, at *6-7 (S.D.N.Y. July 6, 2001) (report and recommendation) (recommending summary judgment where "[n]othing in the record . . . shows that the inmates [who attacked plaintiff] posed a substantial threat"), adopted, No. 98-CV-2078 (RMB) (RLE) (S.D.N.Y. Dec. 11, 2011) (Dkt. 59).

Plaintiff argues that this case is like Knowles v. N.Y.C. Dep't of Corr., 904 F. Supp. 217 (S.D.N.Y. 1995), where the district court denied a motion for summary judgment, finding, in light of evidence submitted by plaintiff of an ongoing "prison war" between Jamaican and Spanish inmates, that there was an objective risk of substantial harm to plaintiff. In Knowles, however, plaintiff put forward evidence that prison officials were aware of the "prison war," and that in light of plaintiff's particular physical appearance, "'risk of assault [was] a serious problem of substantial dimensions.'" Id. at 222 (quoting Walsh v. Mellas, 837 F.2d 789, 793 (7th Cir. 1988)). Here, it is undisputed that Plaintiff himself had no reason to believe he was at risk of harm (from any other inmate, including Simmons), and Plaintiff has not put forward any evidence indicating that Simmons was known by prison officials to be a dangerous or unpredictable inmate.[8]

With respect to the subjective prong, Plaintiff has offered no evidence showing that C.O. Hicks acted with deliberate indifference or criminal recklessness, or that she knew of and disregarded a substantial risk to Plaintiff's safety. As discussed above, Plaintiff admits that he

---

[8] Plaintiff also points to Sanchez v. State, 99 N.Y.2d 247 (2002), arguing that in a case involving an inmate-to-inmate altercation, a plaintiff need only prove that there was a foreseeable risk of harm. Sanchez, however, analyzes an inmate's negligent supervision claim against the State of New York, and does not analyze a constitutional claim under the Eighth Amendment standard. See id.

had not been involved in any incidents with other inmates prior to the August 16, 2012, fight, and that he did not have any expectation that Simmons would attack him. In addition, it is undisputed that C.O. Hicks reacted reasonably to the fight—she approached attentively upon the verbal escalation of the dispute, and upon being pushed out of the way by Simmons, ordered the inmates to cease fighting, and displayed her OC spray to achieve this result.

Plaintiff argues that C.O. Hicks's intervention was delayed, and that she should have intervened before Simmons had the opportunity to punch Plaintiff three times and before Plaintiff was required to fight back in self-defense. (See Pl.'s Mem. in Opp'n ("Pl.'s Opp'n") (Dkt. 119-1) at 7-8 ("C.O. Hicks in this case, knew of a potential harm between plaintiff and the aggressor Mr. Simmons and [had] more than enough time to recognize Mr. Simmons['s] aggressive behavior [and] notice that an attack to the plaintiff was happening. C.O. Hicks was physically violated as a correction officer by inmate Simmons when he physically pushed her out [of] the way of his path to assault the plaintiff, and this is a fact that C.O. Hicks knew of and disregarded . . . .").) But in the context of a "random" attack, such as the one here, this allegation does not tend to demonstrate that C.O. Hicks knew of and disregarded a substantial risk of harm to Plaintiff before the altercation at issue occurred. The court agrees with Plaintiff that under certain circumstances, the commencement of an inmate-to-inmate altercation could put a prison official on sufficient notice to render the prison official deliberately indifferent if he or she then fails to intervene in an appropriate manner. Cf. George v. Burton, No. 00-CV-143 (NRB), 2001 WL 12010, at *3 (S.D.N.Y. Jan. 4, 2001) ("Certainly, the 'pervasive risk of harm' requirement is met when prison guards simply stand by and permit an attack on an inmate by another inmate to proceed." (citing Davidson v. Cannon, 474 U.S. 344, 348 (1996)). Here, however, Plaintiff's

own recounting of the altercation and the undisputed facts submitted by the parties preclude such a conclusion.

Plaintiff argues that C.O. Hicks should have used force in order to break up the fight. (See Pl.'s Opp'n at 8.) However, as Defendants explain, "the subjective prong of a deliberate indifference claim demands that correction officers not disregard a substantial risk of harm to a prisoner, not subject themselves [to] danger by directly intervening between two inmates' fighting." (Defs.' Mem. at 5.) The court is sensitive to the fact that Plaintiff received at least three punches before C.O. Hicks was able to intervene, but her undisputed actions do not show, as Plaintiff claims, that she acted with the culpability required by the deliberate indifference standard. See Desulma, 2001 WL 798002, at *7 ("[A]n isolated omission to act by a state prison guard must be accompanied by evil intent, recklessness, or at least deliberate indifference to the consequences of the conduct. The defendant must also be shown to have had an extended opportunity to stop the attack but failed to take any action to do so." (internal quotations marks and citation omitted)); cf. Williams v. Vincent, 508 F.2d 541, 546 (2d Cir. 1974) (holding that plaintiff failed to state a claim where it was doubtful that defendant's conduct "amounted to more than a split[]second decision to jump back when he suddenly perceived danger to both [plaintiff] and himself" and where there was no allegation "that [defendant], having jumped back initially, stood by and let the attacker further injure [plaintiff]").[9] Here, based on Plaintiff's own

---

[9] In addition, it is undisputed that the attack here occurred quite suddenly. Courts have rejected constitutional claims based on such a circumstance. See, e.g., Rivera, 2014 WL 1998227, at *4 ("At best, Plaintiff has alleged an unexpected incident, but unexpected incidents are insufficient to propagate a deliberate indifference claim."); Fernandez v. N.Y.C. Dep't of Corr., No. 08-CV-4294 (KMW), 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) ("Absent clear notice of a risk of harm to the prisoner, '[c]ourts routinely deny deliberate indifference claims based upon surprise attacks.'" (quoting Zimmerman v. Macomber, No. 95-CV-882 (DAB), 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001)). Plaintiff is correct, however, that the suddenness of an attack does not necessarily preclude a finding of deliberate indifference where there was an objective risk of substantial harm and where prison officials knew of but disregarded such a risk. See, e.g., Knowles, 904 F. Supp. at 219 (denying motion for summary judgment in spite of "sudden" and "unexpected" stabbing of plaintiff by other inmates).

testimony, a reasonable jury could not find that C.O. Hicks's actions rise to the level of deliberate indifference and therefore constitute a constitutional violation.[10]

Finally, qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). As discussed above, based on Plaintiff's own testimony, C.O. Hicks's reaction to the unexpected fight was reasonable, and indeed effective at ending the fight without serious injury to Plaintiff. Thus, C.O. Hicks is entitled to qualified immunity with respect to Plaintiff's failure-to-protect claim. See, e.g., Rivera, 2014 WL 1998227, at *6 (dismissing failure-to-protect claim on qualified immunity grounds where plaintiff failed to allege that he was afraid of inmate who attacked him or that defendant knew of any such fear); Desulma, 2001 WL 798002, at *8 (recommending summary judgment against plaintiff's claim on qualified immunity grounds). Plaintiff disputes whether, in light of the way the fight unfolded, C.O. Hicks's actions were reasonable (see Pl.'s Opp'n at 25-26), but based on the evidentiary record before the court, no reasonable jury could find that it was not objectively reasonable for C.O. Hicks to believe her actions did not violate a clearly established federally protected right.

For these reasons, Plaintiff's failure-to-protect claim is dismissed.

## B. Procedural Due Process Claim

As a result of the fight, Plaintiff was disciplined by prison officials, receiving 12 days of segregated confinement, and a $25 fine. (See Aug. 22, 2012, Hr'g Rep. & Not. of Disciplinary

---

[10] Because Plaintiff must put forward evidence demonstrating deliberate indifference "for each defendant," Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003), his deliberate indifference claim against C.O. Madison also fails, since Plaintiff has offered no evidence tending to show that C.O. Madison (who Plaintiff claims was not present during the fight) knew of and disregarded a substantial risk of harm.

Disposition for Alexis Stewart ("Stewart Hr'g Rep.") (Pl. Decl., Exs. G, H (Dkts. 110-7, -8)).)[11]

Plaintiff also testified that as a result of receiving discipline, he lost certain "good-time" credit, lost access to the commissary, was denied medical treatment, and was strip-searched three times per day. (See Pl.'s Opp'n at 18.)

Throughout this litigation, and including during his deposition, Plaintiff has questioned why C.O. Madison signed the Report and Notice of Infraction, as Plaintiff does not recall C.O. Madison's presence during the fight, and C.O. Madison's name does not appear on the redacted DOC logsheet. In his opposition brief, Plaintiff characterizes Defendants' conduct as a "correctional cover-up," arguing that "if [C.O. Madison] [was] not assigned anywhere in OBCC [on the night in question], how could he have seen this incident let alone have the right to write an Infraction Report AND make mistakes on [the substantive] CHARGES." (Pl.'s Opp'n at 34 (emphases in original).) In other words, as stated during his deposition, Plaintiff has brought suit against C.O. Madison for filing a "false charge" against him, in "violation of [the] due process clause." (Pl. Dep. at 34:16-19.) The court construes Plaintiff's papers to challenge two aspects of his disciplinary hearing: (1) the fact that C.O. Madison filed a charge against him, rather than C.O. Hicks; and (2) the sufficiency of the evidence.

The court addresses the merits of Plaintiff's claim below, but first addresses two threshold issues: (1) the significance, under § 1983, of Plaintiff's alleged loss of good-time credit, and (2) Plaintiff's status at the time of the August 16, 2012, incident.

      1.    Section 1983 Claims and Good-Time Credit

Plaintiff asserted during his deposition that as a result of the discipline, he lost good-time credit, although he was unable to calculate a specific amount of good time lost. (See Pl. Dep. at 37:2-39:8 ("Q: As it pertains to you, how long were you incarcerated at OBCC and what

---

[11] Plaintiff submitted each page of the Stewart Hearing Report as separate, one-page exhibits.

would two-thirds translate to you? A: You can't really say that because I was still in court.");
see also Inmate Disciplinary Due Process Directive, Attach. I (indicating that for Grade II penalty, a "sentence inmate" loses a maximum of two-thirds good time, but not listing any loss of good-time credit for a "detention inmate").)

Defendants argue in a single sentence of their reply brief that the loss of "two-thirds of conditional release time is not a basis for a § 1983 claim." (Defs.' Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. 112) at 6 (citing Douglas v. Yarbrough, 24 F. App'x 61 (2d Cir. 2001) (summary order)).) The reality, however, is not so simple.

In Edwards v. Balisok, 520 U.S. 641 (1997), the Supreme Court held that a § 1983 action is not cognizable where an inmate challenges the procedures used in disciplinary proceedings that resulted in the deprivation of the inmate's good-time credit. Rather, where an alleged procedural defect would "necessarily imply the invalidity of the deprivation of his good-time credits," a plaintiff must show that the discipline he received has previously been invalidated. Id. See also Heck v. Humphrey, 512 U.S. 477, 487 (1994) (holding that § 1983 action is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction, unless that "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus"). In Peralta v. Vasquez, 467 F.3d 98, 104 (2d Cir. 2006), the Second Circuit clarified that the "favorable termination" rule of Balisok and Heck is not an absolute bar to suit for an inmate subject to "mixed" disciplinary sanctions, i.e., "sanctions that affect both (a) the duration of his imprisonment and (b) the conditions of his confinement." Thus, the Second Circuit explained, "a prisoner subject to such mixed sanctions

18

can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, but [] he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement." Id. (emphasis in original). See also, e.g., Richardson v. Dep't of Corr., No. 10-CV-6137 (SAS), 2011 WL 4091491, at *4, *6 (S.D.N.Y. Sept. 20, 2011) (dismissing claim where plaintiff failed to forgo any challenge to the alleged six-month loss of good-time credit); Phelan v. Hersh, No. 10-CV-011 (GLS) (RFT), 2010 WL 277064, at *3-4 (N.D.N.Y. Jan. 20, 2010) (ordering plaintiff who alleged mixed sanction to inform the court whether he waived any future due process claim challenging the alleged loss of good-time credit).

Here, the record before the court does not make clear whether Plaintiff actually lost any good-time credit as a result of the discipline, or whether it was even possible to lose good-time credit when Plaintiff had been convicted but not yet sentenced. Under such circumstances, it is improper for the court to bar the entirety of his procedural due process claim. See, e.g., Johnson v. McClure, No. 06-CV-0431 (GTS), 2009 WL 2356147, at *15-16 (N.D.N.Y. July 28, 2009) (at summary judgment, reaching merits of plaintiff's procedural due process claim related to mixed sanction because "[t]he applicability of Balisok and Peralta to the facts of this case is unclear from the record now before the court"); Britt v. Fawcett, No. 06-CV-633 (LES), 2009 WL 890631, at *4-5 (N.D.N.Y. Mar. 31, 2009) (at summary judgment, reaching merits of plaintiff's procedural due process claim related to mixed sanction because "[b]ased on the record before the Court, it is not clear that [plaintiff's] disciplinary hearing actually resulted in the loss of good-time credits").

What Peralta makes clear, however, is that the loss of good-time credit cannot serve as the basis of Plaintiff's alleged deprivation of due process rights. Below, the court considers the

19

other alleged deprivations raised by Plaintiff; because the court concludes that Plaintiff failed to offer sufficient evidence for his procedural due process claim to survive summary judgment, it need not decide whether Plaintiff's claim is, in fact, related to a mixed sanction and barred by Balisok or requiring a waiver of future claims related to good-time credit under Peralta. See, e.g., Johnson, 2009 WL 2356147, at *16-18 (declining to make ruling concerning mixed sanction because plaintiff's procedural due process claim related to the discipline in question failed on the merits).

### 2. Plaintiff's Status as of August 12, 2012

Plaintiff's status as a pretrial detainee or convicted criminal is relevant for his procedural due process claim, as different legal standards apply to each status. See generally Benjamin v. Fraser, 264 F.3d 175, 188-191 ("Benjamin I") (2d Cir. 2001) (holding that more stringent "atypical and significant hardship" standard described by the Supreme Court in Sandin v. Conner, 515 U.S. 472 (1995), does not apply to pretrial detainees). Neither the Supreme Court nor the Second Circuit has addressed which standard applies to an inmate who has been convicted but not yet sentenced. See Iqbal v. Hasty, 490 F.3d 143, 162 n.8 (2d Cir. 2007) ("We do not consider the question of whether convicted, but unsentenced, inmates are pretrial detainees under the Supreme Court's jurisprudence establishing criteria for evaluating constitutional limits on conditions of confinement."), overruled on other grounds, Ashcroft v. Iqbal, 556 U.S. 662 (2009).

This court agrees with the weight of the authority that an individual such as Plaintiff—who at the time of the alleged constitutional deprivation was awaiting sentencing after pleading guilty to a crime and after being convicted upon such a plea—is no longer a "pretrial detainee" and must meet Sandin's "atypical and significant hardship" standard for his procedural due

process claim. See, e.g., Tilmon v. Prator, 368 F.3d 521, 524 (5th Cir. 2004) ("We hold that a prisoner who has been convicted but has not yet been sentenced has the same status as a sentenced prisoner for purposes of analyzing whether the prisoner has a liberty interest in having certain procedural protections apply before being punished in connection with prison disciplinary proceedings."); Resnick v. Hayes, 213 F.3d 443, 448 (9th Cir. 2000) (applying Sandin framework to procedural due process claim of plaintiff who had been convicted but not yet sentenced); Maldanado v. Kinlock, No. 09-CV-8435 (LAP), 2012 WL 3597049, at *4-5 (S.D.N.Y. Aug. 21, 2012) (declining to define inmate as "pretrial detainee" where "at all times during the relevant period" he was a "convicted inmate," even if during a portion of the period he had yet to be sentenced); Mobayed v. Pastina, No. 94-CV-6386 (BSJ), 1996 WL 751744, at *4 n.6 (S.D.N.Y. Dec. 27, 1996) ("Here, plaintiff is a post-trial detainee—he was on Rikers Island awaiting sentencing, not trial . . . ."). This conclusion comports with the parallel determination by other courts that in the Eighth Amendment context, the protections of the Eighth Amendment begin upon conviction, whether or not the inmate has been sentenced. See, e.g. Berry v. City of Muskogee, 900 F.2d 1489, 1493 (10th Cir. 1990) ("We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished; and we perceive every reason to treat those awaiting sentencing the same as inmates already sentenced. The critical juncture is conviction, either after trial or, as here, by plea, at which point the state acquires the power to punish and the Eighth Amendment is implicated." (citing Bell v. Wolfish, 441 U.S. at 534-44 (1979); Ingraham v. Wright, 430 U.S. 651, 664 (1977)); Jeanty v. Cnty. of Orange, 379 F. Supp. 2d 533, 539 (S.D.N.Y. 2005)

("Consequently, plaintiff's excessive force claim, which arose after he was convicted but before he was sentenced, is to be analyzed under the Eighth Amendment.").

Thus, the court concludes that Plaintiff was not a pretrial detainee, and now applies the Sandin framework to Plaintiff's procedural due process claim.[12]

### 3. Merits of Due Process Claim

Generally, "to present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (internal quotation marks and citation omitted). Plaintiff's due process claim fails because he cannot establish that a protected liberty interest was implicated by the discipline he received. Second, even if Plaintiff could establish that a protected liberty interest was implicated, he has failed to show that he was deprived of the interest as a result of insufficient process.

### a. Liberty Interest

"Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." Sandin v. Connor, 515 U.S. 472, 485 (1995). However, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) (quoting Sandin, 515 U.S.

---

[12] If Plaintiff were classified as a pretrial detainee, the Sandin framework would not apply. See Iqbal, 490 F.3d at 163 ("This Court has said that Sandin does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process." (citing Benjamin I, 264 F.3d at 188-89)). Rather, for a pretrial detainee, the process due depends on whether a particular restraint is "punitive" or "administrative." See generally Best v. N.Y.C. Dep't of Corr., 14 F. Supp. 3d 341, 347-48 (S.D.N.Y. 2014) (describing the framework and the due process requirements for punitive restraints under Wolff v. McDonnell, 418 U.S. 539 (1974), and for administrative restraints under Hewitt v. Helms, 459 U.S. 460 (1983)). The court need not reach whether the Defendants' discipline of Plaintiff was punitive or administrative. However, the court notes that even if the process required by Wolff for punitive restraints of a pretrial detainee governed, it appears that Defendants met such requirements. See Benjamin I, 264 F.3d at 190 (explaining that Wolff requires "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence" (citing Wolff, 418 U.S. at 561-70)).

at 484). Both the duration and the conditions of the confinement are relevant factors. See Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004).

There is no specific duration of segregated confinement that automatically qualifies as an atypical and significant hardship, nor is there a specific duration that is per se not an atypical and significant hardship. The Second Circuit has made clear that segregated confinement of under 101 days can, depending on the circumstances, constitute an atypical and significant hardship, particularly where "a more fully developed record showed that even relatively brief confinements under normal [segregated] conditions were, in fact, atypical." Id. at 65; see also Welch v. Bartlett, 196 F.3d 389 (2d Cir. 1999) (reversing summary judgment where plaintiff put forward evidence that conditions in segregated confinement were "far inferior" to those for the general prison population). Even so, the Second Circuit has "affirmed dismissal of due process claims . . . where the period of time spent in [segregated confinement] was exceedingly short— less than the 30 days that the Sandin plaintiff spent in [segregated confinement]—and there was no indication that the plaintiff endured unusual [segregated] conditions." Palmer, 364 F.3d at 65-66 (citing cases).[13]

Where a plaintiff challenges the conditions (as opposed to the duration) of confinement as an atypical and significant hardship, he must show that "the conditions of his confinement result[ed] 'in unquestioned and serious deprivation of basic human needs,'" and "that the

_____

[13] Defendants argue that for confinements under 30 days in length, "where a plaintiff has not alleged any unusual conditions, district courts are not required to provide a detailed explanation of [their] liberty interest analysis. (Defs.' Mem. at 10 (citing Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998); Arce v. Walker, 139 F.3d 329, 336 (2d Cir. 1998)). See also Hynes, 143 F.3d at 658 ("However, in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation of its reasoning."). The court does not read Hynes to dispose of its obligation to review and adequately analyze the factual record; indeed, as Defendants admit, "the Second Circuit has not adopted a bright-line test to determine what specific length of segregated confinement constitutes atypical and significant hardship." (Defs.' Mem. at 10.) While several district courts have dismissed claims based on less than 30 days of segregated confinement, see Williams v. Keane, No. 95-CV-0379 (AJP) (JGK), 1997 WL 527677, at *6-8 (S.D.N.Y. Aug. 25, 1997) (citing dozens of cases dismissed where plaintiff alleged less than 30 days of segregated confinement), the Second Circuit has never stated that a confinement under 30 days in length cannot be an atypical and significant hardship.

23

defendants imposed those conditions with 'deliberate indifference.'" Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996). In this context, the deliberate indifference standard includes the same objective and subjective prongs discussed above in connection with Plaintiff's failure-to-protect claim. See id. at 481.

Here, Plaintiff failed to offer any evidence showing that the duration or conditions of his twelve-day segregated confinement were an atypical and significant hardship. The duration of the confinement was quite brief in light of Second Circuit case law holding that lengthier durations of segregated confinement did not implicate a liberty interest. In addition, the conditions to which Plaintiff points did not render the confinement atypical, and thereby implicate a liberty interest. Of most significance, Plaintiff failed to introduce any evidence that the conditions he endured in segregated confinement were any worse than the conditions endured by other inmates under similar confinement, and given the brevity of Plaintiff's stay in segregated confinement, the limited evidence offered by Plaintiff of better treatment of the general prison population is not probative of a constitutional violation in this case. See Hynes, 143 F.2d at 658; Welch, 196 F.3d at 394 ("Whether the conditions of [an inmate's] confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.").

Moreover, the actual conditions to which Plaintiff points are not, in fact, an atypical or significant hardship. First, loss of access to the commissary is the loss of a privilege, not the deprivation of a constitutional liberty interest, and accordingly does not qualify as an atypical and significant hardship. See, e.g., Borcsok v. Early, 299 F. App'x 76, 76 (2d Cir. 2008)

24

(summary order) (holding that 90-day confinement and "concurrent loss of privileges" did not constitute an atypical and significant hardship); Torres v. Droun, No. 01-CV-1844 (DJS) (TPS), 2004 WL 721729, at *7 (D. Conn. Mar. 30, 2014) ("[C]ourts have held that denial of commissary privileges do not constitute atypical and significant prison conditions." (citing cases)); Roseboro v. Gillespie, 791 F. Supp. 2d 353, 360, 375-78 (S.D.N.Y. 2011) (granting motion for summary judgment where discipline included 21 days in segregated confinement, and loss of visitation, phone, and commissary privileges for ninety days). Second, Plaintiff's allegation that he was denied medical assistance while in segregated confinement fails to rise to the level of an atypical and significant hardship. Plaintiff testified that he sustained a bloody mouth, swollen eye, and bruises to his hands. (Pl. Dep. at 28:11-24.) These injuries do not rise to the level of a serious medical condition that, under the objective prong of the inquiry, would require immediate attention from prison officials; accordingly, the lack of medical assistance during the period of segregated confinement does not constitute an atypical and significant hardship.[14] See, e.g., Jones v. Vives, 523 F. App'x 48, 49 (2d Cir. 2013) (summary order) (requiring objective showing of "death, degeneration, or extreme pain" (quoting Hathaway II, 99 F.3d at 553)); Benitez v. Straley, No. 01-CV-181 (RCC) (RLE), 2006 WL 5400078, at *3, *4, *14-15 (S.D.N.Y. Feb. 16, 2006) (cuts on lips, head, and hands that did not require stiches were not sufficiently serious to require medical attention under Eighth Amendment); Rodriguez v. Mercado, No. 00-CV-8588 (JSR) (RFM), 2002 WL 1997885, at *3, *8 (S.D.N.Y. Aug. 28, 2002) (migraine and bruises on head, back, and wrists were not a severe injury

---

[14] In addition, Plaintiff testified that he in fact received medical treatment for the limited injuries he sustained shortly after the fight. (See Pl. Dep. at 29:19-30:12.) Plaintiff failed to introduce any evidence suggesting that the injuries he suffered were urgent or life-threatening, or that they required further care. Indeed, when Plaintiff was transferred to another prison approximately one month after the fight, he had no physical injuries to complain of upon arrival at the new facility. (Id. at 31:14-16.) To the extent Plaintiff alleges in passing that his loss of appetite and lack of sleep (due either to the physical injuries or to the fact that he was placed in segregated confinement) constitute a constitutional deprivation, his argument is unavailing.

protected by the Eighth Amendment). Third, the fact that Plaintiff was subjected to strip searches does not render the confinement an atypical and significant hardship. See Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510, 1517 (2012) ("[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities."); Covino v. Patrissi, 967 F.2d 73, 75 (2d Cir. 1992) (affirming denial of injunction against prison's policy of random visual body-cavity searches). Finally, as discussed above, to the extent Plaintiff alleges a loss of good-time credit, the loss of good-time credit cannot provide the basis for a § 1983 claim. See supra Part III.B.1.[15]

### b. Adequacy of the Process

In its analysis above, the court concluded that Plaintiff failed to show that the duration and conditions of his twelve-day confinement violated a protected liberty interest; absent such a showing, Plaintiff's procedural due process claim necessarily fails. See, e.g., Torres v. Mazzuca, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("The corrections officers' failure to properly address [plaintiff's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process because [plaintiff] was not deprived of a protected liberty interest [as a result of the disciplinary hearing].") But even if Plaintiff could demonstrate that the discipline he received was an atypical and significant hardship, and therefore implicated a protected liberty interest, he has failed to demonstrate that he was deprived of the liberty interest as a result of insufficient process.

Plaintiff claims that he was falsely accused by C.O. Madison, since C.O. Madison did not witness the fight. "But a prison inmate has no general constitutional right to be free from being

---

[15] The court also notes that Defendants did not move for summary judgment based on their exhaustion of remedies defense. The court therefore expresses no opinion concerning whether that defense may be meritorious, or whether Defendants have waived the defense. See generally, e.g., Castillo v. Rodas, No. 09-CV-9919 (AJN), 2014 WL 1257274, at *14-16 (S.D.N.Y. Mar. 25, 2014) (surveying case law and analyzing the administrative exhaustion requirement under the Prison Litigation Reform Act of 1996).

falsely accused in a misbehavior report." Boddie v. Schnieder, 105 F.3d 857, 862

(2d Cir. 1997). "Indeed, '[t]he inmate must show something more, such as that he was deprived

of due process during the resulting disciplinary hearing, or that the misbehavior report was filed

in retaliation for the inmate's exercise of his constitutional rights." Mena, 2014 WL 4652570,

at *7 (quoting Velez v. Burge, 483 F. App'x 626, 628 (2d Cir. 2008) (summary order)). Thus,

even if the discipline Plaintiff received implicated his constitutional liberty interest (which, as

discussed above, it did not), the mere fact that C.O. Madison signed the infraction report, absent

other evidence of procedural irregularities, cannot support Plaintiff's claim.

Plaintiff does not argue that C.O. Madison filed the report in retaliation for Plaintiff's

exercise of constitutional rights; nor does he allege that the prison disciplinary process lacked

other procedural safeguards, such as an independent decision-maker who did not issue the initial

infraction, the right to explain his side of the story, the right to written conclusions, or the right to

appeal. Indeed, the materials submitted by Plaintiff indicate that that the Adjudication Captain

relied on staff reports, eyewitness reports, the incident report, the Captain's investigation, and an

injury report in reaching a disciplinary disposition. (See Stewart Hr'g Rep. at 2.) In addition,

the materials indicate that Plaintiff was deemed not to be the initial aggressor, but that he did

admit to fighting. (Id.) Plaintiff was also given several opportunities to defend his actions. (See

Investigation Rep. ("Statement of Inmate Charged: 'He proceeded to attack me so I had no

choice but to defend myself.'"); Stewart Hr'g Rep. at 1 ("Summary of Inmate's Testimony: It

was self defense. I didn't start the fight. I asked the inmate be real thats (sic) his bed right. He

told me to get the fuck out of my face. He swung on me in front of the officer. I had to defend

myself.'").) And Plaintiff had an opportunity (but declined) to request that witnesses attend his

disciplinary hearing. (See Stewart Hr'g Rep. at 1.)

To the extent Plaintiff challenges the actual decision reached during the prison disciplinary proceeding, "there must be, among other things, 'some evidence' to support the sanction imposed." Ortiz, 380 F.3d at 655 (quoting Gaston v. Coughlin, 249 F.3d 156, 163 (2d Cir. 2001)). Based on the court's review of the materials, this appears to be the case. See also Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (noting that the some evidence "standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' the disciplinary ruling" (quoting Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000) (emphasis in original)). The court notes, as well, that it appears that the Adjudication Captain reduced the charges against Plaintiff to account for the fact that was not the instigator and did not cause any bodily injuries. (See Stewart Hr'g Rep. at 2 (reducing a charge under rule 101.12 to a charge under rule 101.17; Inmate Disciplinary Due Process Directive, Attach. I (listing rule 101.12 as "assault that results in injury" and listing rule 101.17 as a lesser included offense, "fighting without a weapon that does not result in injury").)[16]

c.     Plaintiff's Related Claim of Cruel and Unusual Punishment

Finally, to the extent that Plaintiff challenges the discipline he received as a cruel and unusual punishment in violation of the Eighth Amendment, the claim also fails. "In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were 'sufficiently grave' as to constitute a denial of 'the minimal civilized measure of life's necessities,' and (2) the prison officials acted with 'deliberate indifference.'" Roseboro, 791 F. Supp. 2d at 381 (quoting Wilson v. Seiter, 501 U.S. 294, 297-98 (1991)). Here, the court has already determined that the confinement did not constitute an

_____

[16] In light of its determinations that there was no protected liberty interest and no due process violation, the court does not reach whether Defendants are entitled to qualified immunity with respect to the due process claim. The court notes that although Defendants moved for summary judgment on the ground of qualified immunity (among other grounds), Defendants only discussed immunity in connection with Plaintiff's failure-to-protect claim. (See Defs.' Mem. at 13-15; Defs.' Reply at 10-11.)

"atypical and significant hardship," and therefore did not implicate a protected liberty interest. Plaintiff has similarly failed to show that the conditions of his confinement were sufficiently grave as to constitute a denial of the minimal civilized measure of life's necessities, or that Defendants were deliberately indifferent to such conditions. See, e.g., Roseboro, 791 F. Supp. 2d at 380-83 (granting summary judgment on Eighth Amendment claim related to short-term placement in segregated confinement and loss of visitation and commissary privileges, and collecting cases); see also, e.g., Horne v. Coughlin, 155 F.3d 26, 31-32 (2d Cir. 1998) ("We do not think [plaintiff's] six-month [segregated] detention for making sexually threatening comments to a civilian volunteer violated [the Eighth Amendment's] standards").[17]

### C.  Municipal Liability Claims

A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 under a theory of respondeat superior. Monell v. Dep't of Social Servs. of N.Y., 436 U.S. 658, 692 (1978). However, under Monell, a municipality may be held liable for the constitutional violations of its employees when such violations result from the municipality's official policy. Id. at 693. Such a policy may be (1) an express policy, (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law,'" City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (quoting Adickes v. S. H. Kress & Co., 398 U.S. 144, 168 (1970)), or (3) a decision by a person with "final policy making authority," see City of St. Louis, 485 U.S. at 112; Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).

Among the types of municipal policies and customs that can give rise to Monell liability is the failure to monitor, supervise, or discipline employees. In these cases, "[a] Section 1983

---

[17] The court also notes that with respect to all of Plaintiff's claims related to the discipline he received and procedural safeguards, it is unclear whether the named Defendants were, in fact, personally involved and therefore proper defendants under § 1983. Because Plaintiff's claims fail on the merits, the court need not reach this issue.

plaintiff . . . may establish the pertinent custom or policy by showing that the municipality, alerted to the possible [constitutional violation], exhibited deliberate indifference." Id. at 1049. "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." Id. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." Id. The Supreme Court has cautioned, however, that deliberate indifference in this context "is a stringent standard of fault." Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997)).

Here, Plaintiff has sued the City, arguing that it is liable for "letting another inmate assault [him], negligence, and deliberate indifference." (Pl.'s 56.1 ¶ 30; see also Defs.' 56.1 ¶ 22.) The court construes Plaintiff to allege that through its policies, the City exhibited deliberate indifference to his constitutional rights.

First, with respect to Plaintiff's claims based on the City's failure to protect him from Simmons's attack, the court has already determined that Plaintiff failed to demonstrate an underlying constitutional violation. See supra Part III.A. Therefore, the Monell claim necessarily fails. Moreover, Plaintiff has failed to offer any evidence tending to show that the City is liable for such a constitutional violation. Although the Use of Force Directive is an express City policy, its mere existence—including a provision that a correction officer is authorized to use force to protect one inmate from another inmate—does not tend to demonstrate that the City exhibited deliberate indifference to a risk of constitutional violations. Rather, Plaintiff alleges that he was injured as a result of a single, isolated episode of misconduct by a

30

fellow inmate (and the failure of C.O. Hicks to intervene). If anything, by authorizing the use of force, the policy demonstrates that the City is not deliberately indifferent to a risk to inmates. Plaintiff appears to argue that the City is liable because C.O. Hicks did not use force on this occasion. This, however, is not a proper basis for a Monell claim. The claims against the City related to its alleged failure to protect Plaintiff must therefore be dismissed. See also, e.g. Berry v. N.Y. Dep't of Corr., No. 12-CV-7819 (RWS), 2014 WL 2158518, at *8 (S.D.N.Y. May 22, 2014) (dismissing Monell claim predicated on failure-to-protect theory); Fernandez, 2010 WL 1222017, at *6 ("Plaintiff appears to allege a single, isolated episode of misconduct by correction officers . . . in failing to adequately provide for his safety and medical needs. Thus, Plaintiff's claim for municipal liability must be dismissed.").

Second, the court has already determined that Plaintiff failed to demonstrate an underlying constitutional violation with respect to his due process claim. See supra Part III.B. Therefore, that Monell claim also necessarily fails. Moreover, Plaintiff has again failed to offer any evidence tending to show that a City policy, as opposed to an isolated incident, caused the alleged constitutional violation. While Plaintiff did submit the DOC Inmate Disciplinary Due Process Directive, the existence of the policy does not prove that the City exhibited deliberate indifference. On its face, the policy does not indicate that the City exhibits deliberate indifference towards the procedural due process rights of inmates. Rather, it again appears that Plaintiff alleges an isolated incident (receiving twelve days of segregated confinement upon the false claim of C.O. Madison); accordingly, Plaintiff's Monell claim related to the City's disciplinary policy must also be dismissed. See, e.g., Mena, 2014 WL 4652570, at *3 (dismissing Monell claim based on correction officer's alleged false accusations against inmate); Jeffers v. City of New York, No. 13-CV-3305 (JG), 2013 WL 5437337, at *4 (E.D.N.Y.

31

Sept. 27, 2013) (dismissing <u>Monell</u> claim based on disciplinary placement of inmate into segregated confinement); <u>Johnson v. Cnty. of Nassau</u>, No. 01-CV-5996 (DLI) (LB), 2005 WL 991700, at *6-7 (E.D.N.Y. Mar. 31, 2005) (report and recommendation) (dismissing <u>Monell</u> claim based on underlying claim of deliberate indifference to inmate's medical needs), <u>adopted</u>, 2005 WL 991703 (E.D.N.Y. Apr. 19, 2005).

### D. State Law Negligence Claim

Finally, Plaintiff has failed to plead or to show that he complied with New York General Municipal Law § 50-i, which provides that "[n]o action or special proceeding shall be prosecuted or maintained against a city . . . or employee thereof . . . unless a notice of claim shall have been made and served upon the city . . . ." N.Y. Gen. Mun. L. § 50-i(1). Such a notice must be served within ninety days after a claim arises, <u>id.</u> § 50-e(1)(a), and a plaintiff must allege in his complaint that at least thirty days has elapsed since the service of such notice, that the defendant refused to pay the claim, and the action commenced within one year and ninety days after the claim arose, <u>id.</u> § 50-i(1). A plaintiff pleading state law negligence in federal court must comply with these requirements. <u>See, e.g.</u>, <u>Forney v. Forney</u>, No. 13-CV-7193 (WFK) (LB), 2015 WL 1470451, at *6 (E.D.N.Y. Mar. 30, 2015) (dismissing state law claims where notice of claim was untimely); <u>Dingle v. City of New York</u>, 728 F. Supp. 2d 332, 348-49 (S.D.N.Y. 2010) ("Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim."). Here, Plaintiff failed to plead that he satisfied these conditions, and the state law negligence claim is therefore dismissed.[18]

---

[18] Plaintiff argues that he attempted to file a claim with the Court of Claims on the same day he filed the Complaint in this court. (<u>See</u> Pl.'s Opp'n at 27.) But even if Plaintiff had filed a notice of claim on that date, it would have been untimely, as the fight in question occurred almost one year prior to the filing of the Complaint. In addition, Plaintiff argues that he complied with the conditions by bringing suit within one year and ninety days of the fight.

Even if Plaintiff had complied with the conditions for filing a state law negligence claim against Defendants, he has failed to offer any evidence that his injuries were caused by the negligence of C.O. Hicks and C.O. Madison. Rather, Plaintiff's own deposition testimony demonstrates that the injuries Plaintiff sustained were the result of violence by Simmons (not C.O. Hicks), and that C.O. Hicks intervened and ended the altercation in a reasonable manner. For this additional reason, the negligence claim is dismissed.[19]

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED, and all claims against all Defendants are DISMISSED. The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and therefore in forma pauperis status is DENIED for purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     April 2I, 2015

NICHOLAS G. GARAUFIS
United States District Judge

---

(See id.) While it is true that Plaintiff filed the Complaint within the one-year-and-ninety-day statute of limitations, this does not rescue his failure also to file a timely notice of claim.

[19] For all of his claims, Plaintiff also relies on the fact that the court screened his Complaint upon its filing and granted Plaintiff in forma pauperis status. (See Pl.'s Opp'n at 5.) But the fact that a complaint is deemed to be not frivolous or to plausibly state a valid claim upon which relief can be granted (see 28 U.S.C. § 1915(e)) is not determinative of whether a plaintiff has offered sufficient evidence to survive summary judgment.